[Civ. No. 30116. First Dist,, Div. One. May 18, 1973.]

TOWN OF LOS ALTOS HILLS et al., Plaintiffs and Respondents, v. ADOBE CREEK PROPERTIES, INC., et al., Defendants and Appellants.

DAVID BELLUCCI et al., Plaintiffs and Appellants, v. TOWN OF LOS ALTOS HILLS et al., Defendants and Respondents.

(Consolidated Cases.)

## COUNSEL

Anthony A. Lagorio for Defendants and Appellants and for Plaintiffs and Appellants.

Johnston, Miller & Giannini and Faber L. Johnston, Jr., for Plaintiffs and Respondents and for Defendants and Respondents.

## OPINION

**SIMS, J.**—David Bellucci and Beverly A. Bellucci, the plaintiffs in an action for declaratory relief against the respondent Town of Los Altos Hills, an incorporated municipality, and the defendants, along with appel-

lant Adobe Creek Properties, Inc., in an action commenced by that city's complaint for injunction, declaratory relief and abatement of zoning violations, have appealed, with their codefendant, from a judgment and decree made and entered following the stipulated consolidation and the trial of the two actions.

In the first action the Belluccis sought (1) a declaration of the proper meaning and construction of the provisions of the defendant city's zoning ordinance which classified their use of their property as a nonconforming use subject to the prohibitions, limitations and conditions of the zoning ordinance; (2) a declaration that the zoning ordinance is unconstitutional and void in its application to their property (a) in that it has no reasonable relation to the public health, safety, morals, or general welfare, (b) in that it deprives them of their property without due process of law, (c) in that it is discriminatory, arbitrary and unreasonable, and (d) in that the amortization period which requires that all nonconforming uses shall be permanently discontinued not later than January 27, 1976, is arbitrarily and unreasonably short as applied to them; and (3) a permanent injunction restraining the city and the named members of the city council (as to whom the action was dismissed in the pretrial conference order) from enforcing the ordinance against the plaintiffs insofar as it purports to classify their use of their property as a nonconforming use.

In the second action the city (which also purported to join the State of California as a party plaintiff) sought to enjoin eight designated uses[1] of the property on the basis of the allegations of the first two causes of action in its complaint, which respectively alleged (1) that such uses are business operations and uses in violation of the city's zoning ordinances, the first of which was passed and adopted on January 28, 1956, and all of which zoned the property for single family residential use and prohibited such uses; and (2) that such uses are changes, enlargements, alterations and expansions of acknowledged nonconforming uses extant when the zoning was established, and as such violated the zoning ordinances. In a third cause of action the

---

[1]The uses referred to are listed as follows: "(a) Swim and racquet club known as LOS ALTOS HILLS COUNTRY CLUB; (b) Tennis courts; (c) Livery stables; (d) Motel units; (e) Trailers used as living quarters; (f) Trap shooting; (g) Restaurant known as TALLY-HO; (h) Merry-go-round, ferris wheel, race cars, and other carnival apparatus; . . ."

The city joined as defendants, along with the appellants Bellucci, Alfred Bellucci and Norma Jean Bellucci, naming all four individually and doing business as Adobe Creek Lodge. Although the latter two Belluccis answered and appeared in the action they were not enjoined by the judgment and have not appealed. The city also named as a defendant Los Altos Hills Country Club and Does 1 through 1,500 who were allegedly members of that club. No appearance was made on behalf of any of such defendants.

city sought an order and decree to abate the prohibited uses as a nuisance; and, in a fourth cause of action, for declaratory relief, it sought a declaration establishing and delineating the uses which predated and those which postdated the enactment of the provisions of the zoning ordinances.

The pretrial order sets forth in detail the contentions of the city, which filed a pretrial statement, and includes, as well as the issues raised by its complaint, its further contention that the amortization period of 20 years for nonconforming uses is adequate, reasonable and constitutional and that the court should declare that the basic nonconforming use of the property for public picnic grounds which was in effect in 1956 must be discontinued on or before January 27, 1956. The Belluccis' several contentions that the zoning is generally unconstitutional were encompassed by the statement that there was an improper classification between profit and nonprofit recreational activities.

Following trial and extensive briefing the court rendered its decision which was served upon the parties. No findings having been requested (Cal. Rules of Court, rule 232(h)) a judgment and decree was signed, filed and entered. The judgment declares: "1. The Zoning Ordinances of the TOWN OF LOS ALTOS HILLS, and without limitation but rather by way of more specific reference, the present Ordinance No. 78, in prohibiting the operation of recreational facilities on a profit-making basis while at the same time permitting the operation of recreational facilities on a non-profit basis pursuant to a Use Permit, in a residential zoning district, do not constitute a deprivation of property without due process of law nor do they deny equal protection of the laws, and the same are valid and constitutional as applied to the real property hereafter described and as applied to the defendants. [¶] 2. The comprehensive zoning plan as set forth in the Zoning Ordinances of the TOWN OF LOS ALTOS HILLS which eliminates virtually all commercial uses of property within the city does not constitute a denial of equal protection of the laws and the same are neither invalid nor unconstitutional as applied to the real property hereafter described and as applied to the defendants." A third paragraph upholds the amortization provision of the ordinance. A fourth paragraph lists nine uses being conducted on the property, commercial in nature, which the court found to be nonconforming uses not permitted by the regulations of the zoning ordinances, but permissible as nonconforming uses under the terms of the ordinance.[2] A fifth paragraph lists commercial uses

---

[2]Permitted nonconforming uses are: "(a) The operation of the Los Altos Hills Country Club as a commercial private swim and racquet club with initiation fees and dues paid to defendants for the use of facilities; (b) The operation of snack bars; (c) Individual and group picnics; (d) Catering to group dinners, banquets and

which were not in existence at the effective date of the zoning ordinances.[3] The court found that those uses were a prohibited extension of preexisting nonconforming uses. A sixth paragraph enjoins the appellants from causing, permitting or carrying on the property, the uses set forth in paragraph 5, or any uses, other than those set forth in paragraph 4, which are not permitted by the zoning ordinances. Paragraph seven orders the discontinuance of the uses set forth in paragraph 4 by January 27, 1976.

Although appellants appealed from the whole of the judgment their sole contentions on appeal are (1) that the prohibition of the operation of recreational facilities on a profit making basis, while at the same time permitting the operation of similar facilities on a nonprofit basis, denies due process and equal protection of the laws; and (2) that a system of exclusionary zoning which eliminates all, or virtually all, commercial use of property within a particular city constitutes a denial of equal protection of the laws. In the absence of any attack on the other provisions of the judgment, it must be assumed that the court properly determined the scope of the permitted nonconforming uses, and properly upheld the provisions of the ordinance which provided for the discontinuance of such uses on the expiration of the 20-year period. (See *National Advertising Co.* v. *County of Monterey* (1970) 1 Cal.3d 875, 879, and 882-883 [83 Cal.Rptr. 577, 464 P.2d 33], Sullivan, J., dissenting on the facts [app. dism. (1970) 398 U.S. 946 (26 L.Ed.2d 286, 90 S.Ct. 1869)]; *Bohannan* v. *City of San Diego* (1973) 30 Cal.App.3d 416, 425-426 [106 Cal.Rptr. 333]; *City of Los Angeles* v. *Gage* (1954) 127 Cal.App.2d 442, 454-461 [274 P.2d 34]; 1 Anderson, American Law of Zoning (1968) §§ 6.64-6.70, p. 445 et seq.; 8A McQuillin, Municipal Corporations (3d rev. ed. 1965) § 25.190, pp.

---

parties; (e) Carnival equipment and animals installed and used by specific groups for group affairs, on a transitory basis; (f) Entertainers employed for group affairs, and not on any permanent basis; (g) Bands or orchestras utilized for special group affairs, and not on any permanent basis; (h) Use of rental facilities for living on a permanent basis for the public or employees of defendants; (i) Use of trailers as living units for employees of defendants; . . ." The court further declared, "The operation of the Los Altos Hills Country Club described in (a) above represents merely a different method of payment for the recreational use in existence prior to the enactment of the Ordinances in question."

[3]Prohibited nonconforming uses are: "(a) The giving of tennis lessons for a fee; (b) The giving of riding lessons for a fee; (c) The giving of swimming lessons for a fee; (d) The providing of saddle horses or ponies for hire, other than for specific group affairs, and the maintenance of livery stables on said premises; (e) The rental for overnight purposes of motel, hotel, or inn units; (f) The operation of any trailer park business; (g) Any trapshooting operation; (h) The operation of either the Tally-Ho or the Bellucci's Supper Club buildings and premises as restaurants open to the public on a daily basis, or on any basis other than a cater basis to group dinners, banquets and parties; (i) Any permanent or seasonal operation of carnival equipment and apparatus or rides, other than for specific group affairs; . . ."

37-38; and 2 Yokley, Zoning Laws and Practice (3d ed. 1967) § 16-14, p. 282 et seq.)

It is concluded that the zoning ordinances of the city do not deny equal protection of the laws because they eliminate virtually all commercial use of property within the city, and that they do not deny due process of law or equal protection of the laws because they prohibit use for commercial recreational facilities and permit use for nonprofit recreational facilities. The judgment must be affirmed.

The property which is the subject of this litigation was at one time a family estate, consisting of some 90 acres of grounds on which the owners had constructed the original residence, swimming pools, guest houses, and a tennis court. The property had been converted to a commercial public picnic grounds called Adobe Creek Lodge long prior to the city's incorporation and first zoning ordinance. It was improved with an open-air dance pavillion, barbecue pits, picnic tables and a snack bar, and occasionally weddings and other private parties were catered there. It may be concluded that the property was devoted to the uses similar to those which the trial court permitted to continue as nonconforming uses existing at the time of the adoption of the zoning ordinances (see fn. 2 above).

On January 27, 1956 the Town of Los Altos Hills was incorporated as a general law city. It is located in northwest Santa Clara County, southwesterly of the City of Palo Alto and directly west of the Town of Los Altos. The easterly portion is characterized by gently rolling hills. To the west the terrain becomes more precipitous but almost all of it is characterized by natural vegetative cover including many fine oak trees. At the time of incorporation it encompassed 5,325 acres, including on its southerly side the 90 acres owned by plaintiff's predecessor in title. This property fronts on the north of Moody Road which runs along Adobe Creek, and which in 1959 was designated as a collector road in the general circulation plan for the city.

At the time of trial, September 29, 1970, the city's planning director testified that the city embraced eight and one-half square miles, and had a population of approximately 6,800. It is encircled by Palo Alto on almost three sides, northeast, north and west. On the east it is contiguous with Los Altos, and there is some unincorporated area on the east and to the south. The Cities of Sunnyvale and Mountain View lie east of Los Altos, and Cupertino is accessible to the south. A map indicates that the city is served by the Foothill Expressway which forms part of its northeasterly bound-

ary, and that it is bisected by the Junipero Serra Freeway which runs from northwest to southeast.

Prior to incorporation the land holding had been in relatively large parcels which had been developed as country estates. With the coming of intensive urbanization to Santa Clara County those holdings were threatened with development patterns similar to those which were taking place in other parts of the area. It was recognized that the result would have been to destroy the pleasant rural character that existed, and the town was incorporated to protect the existing residents from those threats and to preserve its rural character. Accordingly the first ordinance adopted by the city, on January 28, 1956, was an emergency zoning ordinance which prohibited the use of land for other than for the purpose of a one-family dwelling, unless another use was approved by the city council, or such planning commission as it might establish. The ordinance likewise prohibited, without such approval, any subdivision of land into parcels having less acreage or frontage requirements than was provided under county zoning provisions in effect at the time of incorporation. The ordinance recited in part, ". . . it is . . . essential that restrictions and regulations of an interim nature be adopted until time is had for a permanent plan to be worked out and to assure the orderly and harmonious development of the Town of Los Altos Hills, preserve its unique and distinctive character, protect the character and stability of all the area within the corporate limits of said City, assure sound, fair land use in general and otherwise to protect the public interest, health, comfort and convenience and effect the immediate preservation of the public peace, health and safety and welfare until the permanent plan is developed and an Ordinance based upon the report of the Planning Commission be prepared and adopted."

On July 6, 1959, effective 30 days thereafter, the city council adopted a comprehensive zoning ordinance (Ordinance No. 44), which established, regulated and restricted the use of land, the use, location and height and bulk of buildings, and the area and dimensions of building sites, and further provided for the administration and enforcement of its provisions. The purpose of the ordinance was stated as follows: ". . . This Zoning Ordinance is adopted to protect and guide the growth and expansion of the Town of Los Altos Hills in an orderly manner true to the rural residential character of the community; to provide for space deemed necessary to advance the welfare of the public in assuring adequate light, pure air, safety from conflagration and disaster; to promote the smooth flow of traffic, to provide adequate residential off-street parking facilities, and to solve other conditions arising from concentration of the population."

This ordinance designated the entire city as a "Residential Agricultural

District," and limited the unconditionally permitted uses and structures to "Primary Dwellings" and "Agriculture." Six accessory uses and structures were designated as permitted.[4] Twelve conditional uses and structures were recognized as permitted upon recommendation of the planning commission, and the approval of the city council and the issuance of a permit. These uses included nonprofit recreational facilities.[5] The ordinance further provided that existing nonconforming uses could not be changed, enlarged or altered except to a use permitted by the ordinance; that property so used would revest to conforming use on certain contingencies, and

[4]So far as is material here the ordinance permitted a "Home Occupation" and defined it as follows: "Where the use is entirely subordinate to the primary use of the premises for the home of a family. Where there are not retail sales on the premises, there is no advertising of any visible from off the premises, and no evidence from off the premises of the business, where no parking more than normally required for a residence is permitted and not over one assistant outside the family unit is employed. The raising on the premises of agricultural products and sale thereof is' expressly excepted from the provisions of this Ordinance but is subject to reasonable regulations by the Town of Los Altos Hills."

It also permitted "Barns or other Utility Buildings" and "Accessory Buildings." The latter are defined elsewhere in the ordinance as follows: " 'Accessory Use or Accessory Structure.' A subordinate use or subordinate structure customarily incident to and located on the same lot with the dwelling, including but not limited to private swimming pools, barns and stables."

[5]This section of the ordinance read: "Section VII. CONDITIONAL USES AND STRUCTURES. [¶] In addition to uses permitted, the following uses may be established subject to the recommendation of the Planning Commission and to the approval of the City Council and the issuance of a permit therefor: 7:10 *Public Library.* 7.20 *Churches.* Churches and other places of worship, but not including funeral chapels or mortuary chapels. 7:30 *Recreational Facilities.* Recreational or community center buildings, ground for games and sports, except those customarily carried on primarily the City Council and the issuance of a permit therefor: 7:10 *Public Library.* 7:20 *Public Schools.* 7:60 *Private Schools.* 7:70 *Public Utility and Service Uses.* . . . 7:80 *Fire Stations.* 7:90 *Police Stations.* 7:100 *Private Stables.* . . . A maximum of two (2) horses per .acre, . . ." 7:110 *Recreational Clubs.* No gathering or event at a recreational club which will attract a group larger than the total club membership or gather a number of automobiles in excess of the within-site parking capacity of the club will be permitted without first obtaining a special permit from the City Council. 7:120 *Secondary Dwellings.* Subject to applicable provisions of this or other ordinance, there shall be permitted one secondary dwelling on each parcel of land in one ownership which is of at least one acre in net area. Where any such parcel contains less than one and ninety-nine hundredths (1.99) acres in net area; no kitchen plumbing or other kitchen facilities of any kind shall be maintained or installed in any secondary dwelling, and such dwelling shall be used only as a temporary residence for bona fide non-paying guests of the residents of the dwelling on the same parcel."

"Clubs, Recreational" are elsewhere defined as follows: "Clubs or recreational facilities operated by a non-profit organization."

"Dwelling, Secondary" are there defined as follows: "A structure intended for occupancy or occupied, by humans, which is erected or maintained on land in one ownership upon which land is separately erected or maintained a one family dwelling which is the customary dwelling of the residents."

for discontinuance of any nonconforming use in the event of actual discontinuance for 180 days, and in any event in 20 years.[6]

Thereafter, by resolution adopted December 7, 1959, the city adopted a general plan which recites in part with respect to the use of land: "1. Los Altos Hills is a rural-residential community. . . . [¶] 4. Private recreation areas are provided for in the plan. This approach to filling the need for such services is to be encouraged." With regard to population density the plan states in part, "It is the policy of the Town of Los Altos Hills to limit population density within the Town to a maximum of one family per net acre on those portions of the Town suitable for such development." At that time plaintiffs' property was indicated, on a map of the ultimate land use plan under the legend "private park or club."

On December 4, 1961, effective 30 days after its passage, the city adopted a new comprehensive zoning ordinance (Ordinance No. 78). The provisions of this ordinance, including its purpose, are substantially the same as those in the 1959 ordinance. It continues the entire city as a "Residential-Agricultural District" with uses restricted to "Primary Dwellings" and "Agriculture." The former are defined as follows: "A building designated and/or customarily used as a residence by not more than one family, including all necessary domestic employees of such family needed for operation and maintenance of said dwelling." The six permitted accessory uses and structures (see fn. 4 above) were revised by the substitution

---

[6]Provisions material to this appeal read as follows:

"SECTION XII. NON-CONFORMING USES

"12:10 *Continuation.* Non-conforming use may not be changed, enlarged or altered, nor shall the building, structure or premises in which the same is located be enlarged, reconstructed or structurally altered, unless such use is changed to a use permitted by the terms of this Ordinance.

"12:20 *Reversion to Conforming Use.* When any building or land which has been used other than in conformity with the district of which it is a part and when the Council, after due notice and hearing thereon shall have found that the use has become dangerous, or injurious to the public health, safety or welfare, such use shall forthwith revert to the classification to which it formed an exception. [¶] Should any nonconforming use be changed to another use not specifically authorized by the provisions of this Ordinance, the Council, after due notice and hearing thereon, may order the discontinuance of the previously authorized nonconforming use and the reversion to the classification to which it previously formed an exception. [¶] Nothing in this Ordinance shall prevent the reconstruction, repairing, rebuilding and continued use of any non-conforming building or structure damaged by fire, collapse, explosion or acts of God, subsequent to the date of this Ordinance, wherein the expense of such work does not exceed fifty per cent (50%) of the assessed valuation of the building or structure at the time such damage occurred.

"12:30 *Discontinuance.* (A) A non-conforming use shall be considered as permanently discontinued and may not be resumed, if it is discontinued or abandoned for one hundred eighty (180) days or more within any twelve (12) consecutive calendar months. [¶] (B) A non-conforming use shall be permanently discontinued within twenty (20) years from the effective date of this Ordinance."

of a provision for "Private Stables" for "Barns or Other Utility Buildings." The new provision states in part: "In other than agricultural uses, a maximum of two (2) hoofed animals per acre shall be permitted . . . ." The conditional uses and structures (see fn. 5 above) were revised by the deletion of any reference to "Private Stables" and "Recreational Clubs." An added section related to "House Trailers" as a conditional use, reads in part as follows: "Trailers may not be used as primary or secondary dwellings. A temporary permit for use as a dwelling for not more than thirty (30) days in any calendar year may be issued by the City Clerk upon certification that the use pursuant thereto shall be by a bona fide non-paying guest, . . ." With respect to nonconforming uses (see fn. 6 above) the new ordinance reenacted provisions substantially the same as those in the 1959 ordinance, with the exception that the date for discontinuance of all nonconforming uses was advanced from 20 years from the effective date of Ordinance No. 44 (August 5, 1979) to January 27, 1976.[7]

On November 4, 1963 the city council by resolution adopted amendments to the general plan entitled "General Plan, Revision of 1963." This plan indicates that at that time out of 5,382.50 acres within the city, a total of 996.29 were devoted to nonresidential uses, as follows: streets and highways 296.0, freeway 228.00, and "Schools, Churches, etc." 472.29. With respect to the last category the report comments, ". . . nonresidential uses [other than streets, highways, freeway and educational facilities], with the exception of the Adobe Creek Lodge, occupy relatively small sites and in the aggregate do not make up a significant percentage of this particular type of use."

The plan reiterates the first three recitals quoted above from the 1959 plan with respect to land use. The recitals conclude as follows: "9. Since it is obvious that the 472.29 acres of land in nonresidential use (exclusive of streets and Junipero Serra Freeway) within the Town far exceeds all reasonable relationship to the service needs of the population both now and in the foreseeable future; and since this General Plan will be reviewed at three to five-year intervals; it is the policy of the Town to prohibit any further expansion of nonresidential land uses, except those required by law."

---

[7]The third paragraph of the judgment which upholds this provision of the ordinance recites: ". . . Section 12:30(B) of Ordinance No. 78, which requires that all nonconforming uses be permanently discontinued not later than January 27, 1976, and which amortization provision is substantially a continuation of the previous amortization provision of Ordinance No. 44 contained in Section 12:30(B) thereof, is neither arbitrary nor discriminatory nor unreasonable as applied to the real property hereafter described and as applied to the defendants." In the absence of any claim of error respecting that portion of the judgment it must be concluded that the acceleration of the time for discontinuance which occurred in 1961 was properly approved by the trial court.

Plaintiffs' property is again mapped under the legend for "private park or club." The plan also designates the unincorporated area lying southerly of the city, which is contiguous to the subject property on its westerly, southerly and part of its easterly boundary, as suitable for potential annexation.

In 1966 in order to comply with the provisions of section 11546 of the Business and Professions Code which authorizes a governing body of a city or county to require a dedication of land, or the payment of fees for park or recreational purposes as a condition to the approval of a final subdivision map, the city caused to be prepared a recreation element of its general plan. This plan designates substantially all of the northern half of plaintiffs' property as "Private Park." The plan shows two possible public park sites, neither of which involves plaintiffs' property, and it also suggests that in order to avoid maintenance and supervisory costs, park arrangements could be made with existing schools or neighboring governmental agencies.

On September 3, 1968, the city adopted comprehensive amendments to the 1961 ordinance. The purposes were expanded to tie them in with the "General Plan" and to add, among other purposes "to preserve and enhance the natural beauty of the community." Two classes of districts were created, "(1) R-A (Residential-Agricultural) [¶] (2) OSR (Open Space Reserve)." (Note, Gov. Code, §§ 65910-65912, as added by Stats. 1970, ch. 1590, § 16, p. 3317.) According to a zoning map adopted with the ordinance, the only portion of the city included in the second category was a triangular parcel of five or ten acres adjacent to the Junipero Serra Freeway. The following primary uses are permitted in Open Space Reserve Districts: "a. Agricultural uses including horticulture and grazing, but excluding structures. [¶] b. Forest preserves. [¶] c. Other open space uses."

The sections relating to primary uses and accessory uses, and to conditional uses were renumbered without substantial change in text.

On June 1, 1970, the ordinance was amended to permit covenants as well as churches. "Convent" was defined as follows: "A residence facility for participants in a religious order or organization; provided, however, that no money or other consideration is required to be paid by the residents to the proprietor." The number of residents was limited to 35 times the estimated maximum number of lots which would be permitted on the whole of the property devoted to the convent use.

The parcel involved was purchased by appellants Bellucci, Bellucci's brother and the latter's wife (see fn. 1 above) and two other persons in

July 1961. Thereafter those appellants acquired the interests of their co-owners, and at the time of trial they were the sole owners of the property. Appellant Adobe Creek Properties, Inc. is a corporation, wholly owned by the Belluccis. It conducts the business operations on the premises under an oral lease from the owners.

The major portion of the trial was devoted to the production of evidence bearing upon the uses of the property as they existed in 1956, when the town was incorporated and the first zoning ordinance was adopted, and the uses of the property as operated by appellants from the time of their acquisition of the property up to and including the time of trial. Such latter evidence as bears upon the question of the validity of the alleged discrimination under the zoning ordinance, and other evidence bearing on related existing uses within the city is reviewed below (see part II below).

## I

The property owners claim that a system of exclusionary zoning which eliminates all, or virtually all, commercial use of property within a particular city constitutes a denial of equal protection of the laws. The question raised has apparently not been resolved in this state, although there are some decisions which appear to have peripheral relationship to the issue. In *Reynolds* v. *Barrett* (1938) 12 Cal.2d 244 [83 P.2d 29] the court upheld a judgment ordering the issuance of a building permit for a business structure on a parcel zoned for residential use because it was entirely surrounded by properties used for business, semi-business or public purposes (12 Cal.2d at pp. 250-252). The decision, however, rejected the theory that the zoning ordinance was generally invalid because it created a monopoly of ownership and use in that the existing business district in the area in which the parcel lay was completely occupied, and because the city should have provided a larger area for business purposes. The court stated, "The record, without conflict, shows that Piedmont is primarily a residential city. Its charter so declares. It is entirely surrounded by the city of Oakland in which are located many business houses which maintain frequent and adequate delivery service to all parts of Piedmont. The Grand Avenue Business District created by the challenged ordinance is not fully built up. The people of the city of Piedmont have shown a determined effort to keep their city a residential city. This they have the legal right, within constitutional limits, to do. The power to declare zoning ordinances unconstitutional only should be exercised where no substantial reason exists to support the determination of the city council. If the reasonableness of the ordinance is reasonably debatable the ordinance must be upheld. [Citation.]" (*Id.,* at p. 249.) Whatever support the respondent city can find for

the right to zone for exclusive residential use in that opinion is diluted by its reference to the fact that another business district within the city is not fully built up, and a subsequent statement "The fact that the Highland Business District is fully occupied does not invalidate the ordinance as long as another business zone not fully occupied exists" (*id.*, pp. 249-250), both of which indicate that some provision must be made for a business district. (See also *Willett & Crane* v. *City of Palos etc. Estates* (1950) 96 Cal.App.2d 757, 763 [216 P.2d 85].)

Earlier it had been determined that when the municipality creates two districts one of which is to be devoted to residential uses and the other to business uses, it has made a legislative finding that the maintenance of both such districts is necessary to the public welfare, and that it therefore is the duty of the governing body when zoning the city to make adequate provision for both such uses. (*In re White* (1925) 195 Cal. 516, 520 [234 P. 396]; and see *Wickham* v. *Becker* (1929) 96 Cal.App. 443, 446-448 [274 P. 397].) These cases explain the *Reynolds'* court reference to the necessity of creating a business district. Here the general plans and zoning ordinances all indicated that a commercial district was unnecessary and unwanted.

A further suggestion of similar tenor is found in *Biscay* v. *City of Burlingame* (1932) 127 Cal.App. 213 [15 P.2d 784]. There the issue was whether a garage erected in 1928 under a building permit for a private garage, but used for a public garage business, was a permitted nonconforming use under an ordinance adopted in 1929 which zoned the property as residential. The city relied upon prior ordinances which classified the property as residential in attempting to show that the business use was illegally created. The court reviewed the earlier ordinances, and, in the course of concluding that none of them operated to make the use of the property for business or trade purposes unlawful because they were neither general nor comprehensive (127 Cal.App. at pp. 216-219), observed: "The earlier ordinances arbitrarily established a residential district without regard to business which might be necessary in that district" (*id.*, p. 217), and "There is no indication found in the earlier ordinances of the City of Burlingame, upon which respondents are relying, that the city council, in passing those ordinances, had in mind anything other than an arbitrary setting aside of a very large part of the city for residential purposes without regard to the commercial and industrial needs of the community." (*Id.*, p. 218.) In this case, however, there have been clear declarations of the uses which the governing body of the city has determined should be permitted within its territorial limits.

Subsequent cases indicate that there is no necessity to provide a district

for every type of use. In *Snow* v. *City of Garden Grove* (1961) 188 Cal. App.2d 496 [10 Cal.Rptr. 480], the court stated: "It is therefore well established that a city of the size and limited area of the city of Garden Grove is not obligated to make provision for the location and operation within its city limits of any and all known industries regardless of other considerations, provided its actions are not arbitrary, unreasonable or not done fraudulently and are done to insure maximum protection of the several conflicting private interests and minimum detriment to the community and to safeguard public health, safety, comfort and general welfare." (188 Cal.App.2d at p. 502. See also *Wood* v. *City Planning Commission* (1955) 130 Cal.App.2d 356, 364 [279 P.2d 95].)

The property owners refer to the provisions of the Government Code dealing with local planning. (Tit. 7, ch. 3, § 65100 et seq.) Section 65302 provides in part, ". . . The plan shall include the following elements: [¶] (a) A land use element which designates the proposed general distribution and general location and extent of the uses of the land for housing, business, industry, open space, including agriculture, natural resources, recreation, and enjoyment of scenic beauty, education, public buildings and grounds, solid and liquid waste disposal facilities, and other categories of public and private uses of land. . . ." It is obvious that this is not a mandate to create sufficient districts so that each use named may be enjoyed within the territory embraced by any municipality. The following chapter (tit. 7, ch. 4, § 65800 et seq.) which deals with zoning regulations provides in section 65850: "Pursuant to the provisions of this chapter, the legislative body of any county or city by ordinance *may* [¶] (a) Regulate the use of buildings, structures and land as between industry, business, residents, open space, including agriculture, recreation, enjoyment of scenic beauty and use of natural resources, and other purposes." Section 65851 reads, "For such purposes the legislative body *may* divide a county, a city, or portions thereof, into zones of the number, shape and area it deems best suited to carry out the purpose of this chapter." (Italics added in both sections.)

In some jurisdictions it has been held that enabling state legislation of similar tenor requires the local governing body to make provision for more than one basic use of the land under its control. (See *Gundersen* v. *Village of Bingham Farms* (1964) 372 Mich. 352, 354-357 [126 N.W.2d 715, 716-717]; *City of Moline Acres* v. *Heidbreder* (Mo. 1963) 367 S.W.2d 568, 572-575; and *Suburban Ready-Mix Corp.* v. *Village of Wheeling* (1962) 25 Ill.2d 548, 552 [185 N.E.2d 665, 667].) In the Missouri case, on which the Michigan court relied, the court observed: "The ordinary concept of 'zoning' is to 'mark off into zones . . . to partition . . . by

ordinance into zones or sections reserved for different purposes . . . .' Webster's Third New International Dictionary." (367 S.W.2d at p. 572.) After reviewing other definitions it concluded, "In other words, a *'zoning,'* in its ordinary sense, does not mean the creation of *one* district or zone of a town, an area, or the world in general (as, for instance, we have Torrid, Temperate and Artic Zones)." (*Id.,* at p. 573.)

Seven years after its original decision the Missouri court recanted. In *McDermott* v. *Village of Calverton Park* (Mo. 1970) 454 S.W.2d 577, 581, the court concluded: "We have carefully re-examined Moline Acres and have concluded that it is not sound and should therefore no longer be followed." The court determined that the statutes did not require multiple-use zoning, and that a one-use zoning ordinance could be upheld when it did, as it did in that case, promote health, safety, morals and the general welfare. The court embraced the views found in *Valley View Village* v. *Proffett* (6th Cir. 1955) 221 F.2d 412, 416-417 and *Connor* v. *Township of Chanhassen* (1957) 249 Minn. 205, 212-214 [81 N.W.2d 789, 795-796]. (See also *Jameson* v. *St. Tammany Parish Police Jury* (La.App. 1969) 225 So.2d 720, 723; *Town of Plainfield* v. *Hood* (1968) 108 N.H. 502, 506 [240 A.2d 60, 64]; *Duffcon Concrete Products* v. *Borough of Cresskill* (1949) 1 N.J. 509, 512-514 [64 A.2d 347, 349-350, 9 A.L.R.2d 678, 681]; and *Leary* v. *Adams* (1933) 226 Ala. 472, 477 [147 So. 391, 395-396].) In *Valley View Village* v. *Proffett, supra,* the court found that the Ohio statute, as does the California statute, used the word "may." It construed that word as permissive and further noted that it is generally established that the regulation by a municipality of the use within its border is within the powers of local government, specifically its police power (221 F.2d at p. 416).

The case also sets forth reasons why an ordinance which places all the areas of a city in a residential district is not unconstitutional as a matter of law. The court stated, "Traditional concepts of zoning envision a municipality as a self-contained community with its own residential, business and industrial areas. It is obvious that Valley View, Ohio, on the periphery of a large metropolitan center, is not such a self-contained community, but only an adventitious fragment of the economic and social whole. We cannot conclude as a matter of law that an ordinance which places all of the area of such a village into a residential district is *per se* arbitrary and unreasonable, with no substantial relation to the public health, safety, morals or general welfare. It would appear contrary to the very purposes of municipal planning to require a village such as Valley View to designate some of its area for business or industrial purposes without regard to the public need for business or industrial uses. The council of such a village should

not be required to shut its eyes to the pattern of community life beyond the borders of the village itself. We think that it is not clearly arbitrary and unreasonable for a residential village to pass an ordinance preserving its residential character, so long as the business and industrial needs of its inhabitants are supplied by other accessible areas in the community at large.

"Situations in which the legislative body of a municipality would even desire to put its entire area into but one use district are no doubt rare. Situations in which such an ordinance would withstand constitutional attack with respect to the impact upon particular property within the municipality are perhaps even rarer. We conclude only that, if otherwise permitted by the Constitution and statutes of the state, a one-use ordinance is not necessarily so arbitrary and unreasonable as in every case to be invalid." (221 F.2d at p. 418. See also *Cadoux* v. *Planning & Zoning Com'n of Town of Weston* (1972) 162 Conn. 425, 429-430 [294 A.2d 582, 583-584]; *Jameson* v. *St. Tammany Parish Police Jury* (La.App.) *supra,* 225 So.2d 720, 724; *Town of Plainfield* v. *Hood, supra,* 108 N.H. 502, 506 [240 A.2d 60, 64]; *Rockingham Hotel·Company* v. *North Hampton* (1958) 101 N.H. 441, 444 [146 A.2d 253, 255]; *Oregon City* v. *Hartke* (1965) 240 Ore. 35, 46-50 [400 P.2d 255, 261-263]; *Blank* v. *Town of Lake Clarke Shores* (Fla.App. 1964) 161 So.2d 683, 686; *Gautier* v. *Town of Jupiter Island* (Fla.App. 1962) 142 So.2d 321, 323-324; *Fanale* v. *Hasbrouck Heights* (1958) 26 N.J. 320, 325 [139 A.2d 749, 752]; and *Duffcon Concrete Products* v. *Borough of Cresskill, supra,* 1 N.J., 509, 514-515 [64 A.2d 347, 350-351, 9 A.L.R.2d 678, 682]. Cf. *Rockhill* v. *Chesterfield Township* (1957) 23 N.J. 117, 127 [128 A.2d 473, 479]; *Guaclides* v. *Borough of Englewood Cliffs* (1951) 11 N.J.Super. 405, 411 [78 A.2d 435, 438]; *Connor* v. *Township of Chanhassen, supra,* 249 Minn. 205, 212-214 [81 N.W.2d 789, 795-796]; *Golden* v. *Planning Board of Town of Ramapo* (1972) 30 N.Y.2d 359 [334 N.Y.S.2d 138, 285 N.E.2d 291] [app. dism. (1972) 409 U.S. 1003 (34 L.Ed.2d 294, 93 S.Ct. 436 and 440)]; cf. Scillepi, J., at pp. 373-380 [334 N.Y.S.2d at pp. 147-153, 285 N.E.2d at pp. 298-303] with Breitel, J., dissenting at pp. 384-385 and 387-389 [334 N.Y.S.2d at pp. 157-158 and 160, 285 N.E.2d at pp. 306 and 307-308]; *Fox Meadow Estates* v. *Culley* (1931) 233 App.Div. 250, 251-252 [252 N.Y.S. 178, 179-180], affd. (1933) 261 N.Y. 506-507 [185 N.E. 714]; cf. *Nehrbas* v. *Incorporated Village of Lloyd Harbor* (1957) 2 N.Y.2d 190, 195 [159 N.Y.S.2d 145, 140 N.E.2d 241, 244, 61 A.L.R. 2d 965]; *Gardner* v. *Leboeuf* (1960) 24 Misc.2d 511, 516 [204 N.Y.S.2d 468, 472-473], affd. (1962) 15 App.Div.2d 815 [226 N.Y.S.2d 678]; *Gignoux* v. *Village of Kings Point* (1950) 199 Misc. 485, 487-492 [99 N.Y.S. 2d 280, 282-286]; and *Village of Old Westbury* v. *Foster* (1948) 193 Misc. 47, 48-49 [83 N.Y.S.2d 148, 150], with *Vernon Park Realty* v. *City of*

*Mount Vernon* (1954) 307 N.Y. 493, 498-499 [121 N.E.2d 517, 519], and *Dowsey* v. *Village of Kensington* (1931) 257 N.Y. 221, 230-231 [177 N.E. 427, 430, 86 A.L.R. 642].)

Some jurisdictions have adopted a contrary approach. In Pennsylvania in *Bryan* v. *City of Chester* (1905) 212 Pa. 259 [61 A. 894] it was determined, before there was any statutory authority for zoning (see *Norate Corporation* v. *Zoning Board of Adjustment* (1965) 417 Pa. 397, 406, fn. 9 [207 A.2d 890, 895, fn. 9], that the power to regulate billboards was limited as follows: " '. . . a secure structure, which is not an infringement upon the public safety, and is not a nuisance, cannot be made one by legislative fiat, and then prohibited. [Citations.]' " (212 Pa. at p. 262 [61 A. at p. 895, quoting from *Crawford* v. *City of Topeka*, 51 Kan. 756 [33 P. 476].) Sixty years later the court looked backward and concluded, "Granted that our courts now look with more liberality upon a municipality's police power as to sign advertising than when *Bryan* was decided, the rationale of *Bryan* is apposite in determining the validity of the instant ordinance which places a blanket prohibition on all 'off-site' sign advertising in the entire municipality. Such an ordinance is too general, too broad and unreasonable. [¶] In our view, the instant ordinance does not attempt to regulate but to prohibit and the prohibition, without any regard for the districts set up under the Zoning Ordinance, extends throughout the Township to all 'off-site' sign advertising. Such ordinance is patently unreasonable and invalid." (*Norate Corporation* v. *Zoning Board of Adjustment*, *supra*, 417 Pa. at p. 407 [207 A.2d at p. 895], fns. omitted. See also *In re Appeal of Ammon R. Smith Auto Co.* (1966) 423 Pa. 493, 495-497 [223 A.2d 683, 684-685].)

Subsequently in *National Land and Investment Company* v. *Kohn* (1965) 419 Pa. 504 [215 A.2d 597], the court struck down a zoning ordinance which purported to create a four-acre minimum building site in about 30 percent of the area of the township. The court brushed aside the legislative body's contentions respecting pollution of water from sewage by increased density, inadequacy of township roads to accommodate more intense development, problems of fire protection, preservation of the "character" of the area through creation of a greenbelt, provision of a proper setting for historic sites and architecturally and historically interesting old homes and retention of the rural character of the area. In so doing it observed, "Zoning is a tool in the hands of governmental bodies which enables them to more effectively meet the demands of evolving and growing communities. It must not and can not be used by those officials as an instrument by which they may shirk their responsibilities. Zoning is a means by which a governmental body can plan for the future—it may not be used as

a means to deny the future. . . . Zoning provisions may not be used, however, to avoid the increased responsibilities and economic burdens which time and natural growth invariably bring. [¶] It is not difficult to envision the tremendous hardship, as well as the chaotic conditions, which would result if all the townships in this area decided to deny to a growing population sites for residential development within the means of at least a significant segment of the people." (419 Pa. at pp. 527-528 [215 A.2d at p. 610], fns. omitted. See also *Appeal of Girsh* (1970) 437 Pa. 237, 243-244 [263 A.2d 395, 398].)

The court concluded, "Four acre zoning represents Easttown's position that it does not desire to accommodate those who are pressing for admittance to the township unless such admittance will not create any additional burdens upon governmental functions and services. The question posed is whether the township can stand in the way of the natural forces which send our growing population into hitherto undeveloped areas in search of a comfortable place to live. We have concluded not. A zoning ordinance whose primary purpose is to prevent the entrance of newcomers in order to avoid future burdens, economic and otherwise, upon the administration of public services and facilities can not be held valid." (*Id.*, at p. 532 [*id.*, at p. 612]. See also *Appeal of Girsh, supra,* 437 Pa. at p. 242 [263 A.2d at p. 397].)

In *Exton Quarries, Inc.* v. *Zoning Board of Adjustment* (1967) 425 Pa. 43 [228 A.2d 169] the same court struck down a township-wide prohibition of quarrying, after similarly substituting its judgment of the evils to be prohibited for that of the body which adopted the zoning ordinance. The court observed, "The constitutionality of zoning ordinances which totally prohibit legitimate businesses such as quarrying from an entire community should be regarded with particular circumspection; for unlike the constitutionality of most restrictions on property rights imposed by other ordinances, the constitutionality of total prohibitions of legitimate businesses cannot be premised on the fundamental reasonableness of allocating to each type of activity a particular location in the community. We believe this is true despite the possible existence outside the municipality of sites on which the prohibited activity may be conducted, since it is more probable than not that, as the operator of the prohibited business is forced to move further from the property he owns, his economic disadvantage will increase to the point of deprivation. Moreover, if one municipality may, with only moderate justification, totally prohibit an undesired use of land, it is not unlikely that surrounding municipalities will do the same—thus increasing the distance to an alternative site and the concomitant economic disadvantage. Thus the possible availability of alternative sites somewhere out-

side the municipality on which the totally banned business may be conducted does not make permissible the deprivation within the township of property rights imposed by a municipality-wide ban of a particular kind of business. For these reasons, we believe that a zoning ordinance which totally excludes a particular business from an entire municipality must bear a more substantial relationship to the public health, safety, morals and general welfare than an ordinance which merely confines that business to a certain area in the municipality." (425 Pa. at pp. 59-60 [228 A.2d at p. 179]. See also *Appeal of Girsh, supra,* 437 Pa. at pp. 242-243 [263 A.2d at pp. 397-398].)

In *Appeal of Girsh, supra,* four justices of a seven-man court applied the quoted principles to strike down the provisions of a zoning ordinance which failed to provide for the construction of apartments except as they might be allowed under a variance procedure. The majority observed, "Statistics indicate that people are attempting to move away from the urban core areas, relieving the grossly over-crowded conditions that exist in most of our major cities. Figures show that most jobs that are being created in urban areas, including the one here in question, are in the suburbs. New York Times, June 29, 1969, p. 39 (City Edition). Thus the suburbs, which at one time were merely 'bedrooms' for those who worked in the urban core, are now becoming active business areas in their own right. It follows then that formerly 'outlying,' somewhat rural communities, are becoming logical areas for development and population growth—in a sense, suburbs to the suburbs. With improvements in regional transportation systems, these areas also are now more accessible to the central city.

"In light of this, Nether Providence Township may not permissibly choose to only take as many people as can live in single-family housing, in effect freezing the population at near present levels. Obviously if every municipality took that view, population spread would be completely frustrated. Municipal services must be provided *somewhere,* and if Nether Providence is a logical place for development to take place, it should not be heard to say that it will not bear its rightful part of the burden." (437 Pa. at pp. 244-245 [263 A.2d at pp. 398-399].) They concluded, "Apartment living is a fact of life that communities like Nether Providence must learn to accept. If Nether Providence is located so that it is a place where apartment living is in demand, it must provide for apartments in its plan for future growth; it cannot be allowed to close its doors to others seeking a 'comfortable place to live.' " (*Id.,* p. 246 [*id.,* p. 399].)

In *Town of Hobart* v. *Collier* (1958) 3 Wis.2d 182 [87 N.W.2d 868] the opinion states: "From the evidence in this case only one conclusion may be

drawn. The boundaries of the town are not the proper boundaries for the creation of a residential district; this is admitted by the town itself. Under these circumstances, clearly it was an abuse of discretion to so establish them." (3 Wis.2d at p. 191 [87 N.W.2d at p. 873].) The dissent, however, points out, "As we interpret the majority opinion, a zoning ordinance which creates a single use district is only unconstitutional if there are lands situated therein which are unfitted for any of the uses permitted under the ordinance." (*Id.*, at p. 192 [*id.*, at p. 873].)

A similar thought has been expressed, but not applied, in *Southern Alameda Span. Sp. Org.* v. *City of Union City, Cal.* (9th Cir. 1970) 424 F.2d 291 where the court, in determining a procedural question with reference to an injunction sought to restrain alleged discrimination in proceedings for public housing, observed: "Surely, if the environmental benefits of land use planning are to be enjoyed by a city and the quality of life of its residents is accordingly to be improved, the poor cannot be excluded from enjoyment of the benefits. Given the recognized importance of equal opportunities in housing, it may well be, as matter of law, that it is the responsibility of a city and its planning officials to see that the city's plan as initiated or as it develops accommodates the needs of its low-income families, who usually—if not always—are members of minority groups." (424 F.2d at pp. 295-296. See also *Oakwood at Madison, Inc.* v. *Township of Madison* (1971) 117 N.J.Super. 11, 20 [283 A.2d 353, 358].)

The principles expressed in the foregoing cases may not be lightly set aside. There is increasing concern that exclusionary zoning by proliferating small suburban communities is not in the public welfare. (See Roberts, *Demise of Property Law* (1971) 57 Cornell L.Rev. 1, 6-29; *Symposium Exclusionary Zoning* (1971) 22 Syracuse L.Rev., particularly Anderson, *Introduction* 465, at p. 467; Williams & Norman, *Exclusionary Land Use Controls* 475, 498-503; Davidoff & Davidoff, *Opening the Suburbs* 509, 509-512; and Comment, *A Survey of the Judicial Responses to Exclusionary Zoning*, 537, 562-582; Sager, *Exclusionary Zoning* (1969) 21 Stan. L.Rev. 767, 780-800; and Frieden, *Legal Role in Urban Development* (1965) 12 U.C.L.A. L.Rev. 856, 861.)

Whatever merit there may be for breaking down the exclusionary practices in order to enable the less affluent, including racial minorities, to find a home out of the city, this case does not appear to be the vehicle for pursuing such theories.[8] The appellants seek to preserve what is a commercial

---

[8] In *Ybarra* v. *The City of the Town of Los Altos* (N.D.Cal. 1973) —— F.Supp. ——, —— the court rejected the contention that an optionee, representing an unincorporated coalition of Mexican American organizations in Santa Clara County could

place of amusement against the claims of their neighbors for a domestic life free from the distractions and problems attendant to a commercial development. There is no evidence to show that the county or regional situation is such that no recreational areas will be available unless Adobe Creek Properties, Inc. is permitted to continue operations. There is no showing as to whether the customers of the picnic grounds are poor or affluent, or whether there are other locations outside of the city where the proprietors may operate a similar enterprise, and its customers may obtain similar amusement.

Under these circumstances the findings of the city council in its zoning ordinances and adopted plans and established principles of zoning sustain the exclusionary provisions of the ordinance insofar as they prohibit commercial development of recreational areas. "It is well settled that zoning ordinances, when reasonable in object and not arbitrary in operation, constitute a justifiable exercise of police power, and that the establishment, as part of a comprehensive and systematic plan, of districts devoted to strictly private residences or single family dwellings, from which are excluded business or multiple dwelling structures, is a legitimate exercise of the police power. [Citations.] . . . [¶] Every intendment is in favor of the validity of the exercise of police power, and, even though a court might differ from the determination of the legislative body, if there is a reasonable basis for the belief that the establishment of a strictly residential district has substantial relation to the public health, safety, morals or general welfare, the zoning measure will be deemed to be within the purview of the police power. [Citations.]" (*Wilkins* v. *City of San Bernardino* (1946) 29 Cal.2d 332, at pp. 337, and 338-339 [175 P.2d 542]. See also *Euclid* v. *Ambler Co.* (1926) 272 U.S. 365, 388-395 [71 L.Ed. 303, 310-314, 47 S.Ct. 114]; *Consolidated Rock Products Co.* v. *City of Los Angeles* (1962) 57 Cal.2d 515, 522-523 [20 Cal.Rptr. 638, 370 P.2d 342], app. dism. (1962) 371 U.S. 36 [9 L.Ed.2d 112, 83 S.Ct. 145]; *Roman Cath. etc. Corp.* v. *City of*

construct multi-family dwellings in the Town of Los Altos Hills because the zoning restricting use of the property to single family dwellings on one-acre sites was invalid in that it violated the supremacy clause of the United States Constitution since it conflicted with federal housing laws, because it deprived the optionee of its property without due process of law, and because it deprived the prospective users of the multi-family dwellings of equal protection of the law. The court found that Congress had left the question of development under the National Housing Act to local option; that the ordinance did not violate due process because its provisions were not arbitrary or unreasonable; and that although the ordinance admittedly made it impossible for persons of low income to obtain housing within the city it did not discriminate on the grounds of race because all with adequate means, regardless of ancestry could acquire housing in the city, and that constitutional decisions which prohibited discrimination on the basis of wealth were inapplicable because the facts failed to show a duty to furnish housing to the less affluent from outside the city.

*Piedmont* (1955) 45 Cal.2d 325, 326 [289 P.2d 438]; *McCarthy* v. *City of Manhattan Beach* (1953) 41 Cal.2d 879, 885-886 [264 P.2d 932] [cert. den. (1954) 348 U.S. 817 (99 L.Ed. 644, 75 S.Ct. 29)]; *Clemons* v. *City of Los Angeles* (1950) 36 Cal.2d 95, 98-99 [222 P.2d 439]; *Lockard* v. *City of Los Angeles* (1949) 33 Cal.2d 453, 460-461 [202 P.2d 38, 7 A.L.R.2d 990] [cert. den. (1949) 337 U.S. 939 (93 L.Ed. 1744, 69 S.Ct. 1516)]; *Reynolds* v. *Barrett, supra,* 12 Cal.2d 244-249; *Miller* v. *Board of Public Works* (1925) 195 Cal. 477, 490 [234 P. 381, 38 A.L.R. 1479], app. dism. (1927) 273 U.S. 781 [71 L.Ed. 889, 47 S.Ct. 460]; *City of Long Beach* v. *California Lambda etc. Fraternity* (1967) 255 Cal.App.2d 789, 795 [63 Cal.Rptr. 419, 25 A.L.R.3d 912]; *City of Los Altos* v. *Silvey* (1962) 206 Cal.App.2d 606, 610 [24 Cal.Rptr. 200]; *Minney* v. *City of Azusa* (1958) 164 Cal.App.2d 12, 24-26 [330 P.2d 255], app. dism. (1959) 359 U.S. 436 [3 L.Ed.2d 932, 79 S.Ct. 941]; *Willett & Crane* v. *City of Palos etc. Estates* (1950) 96 Cal.App.2d 757, 761-762 [216 P.2d 85]; and *Corp. Presiding Bishop* v. *City of Porterville* (1949) 90 Cal. App.2d 656, 658-659 [203 P.2d 823], app. dism. (1949) 338 U.S. 805 [94 L.Ed. 487, 70 S.Ct. 78].)

The conclusion that the ordinance should be sustained against attack on the grounds that it fails to contain sufficient provision for uses other than single family residential on lots of at least one acre in size, is supported by the general judicial favoritism shown to that form of living. The paeans of praise for the single family residence uttered by Mr. Justice Lennon (himself a judge from the rural suburban County of Marin), in *Miller* v. *Board of Public Works,* should be required reading for any real estate subdivision salesman. (See 195 Cal. at pp. 492-493.)

In the attacks on exclusionary zoning it is pointed out that the greatest evil is that each suburban community is providing for its own public health, safety, morals and welfare, and as a result the general welfare of the community or region as a whole suffers socially, economically and politically. Nevertheless, from all that appears in this case any general, regional or community plan might itself well have determined that the area now embraced in respondent city should have been zoned as it has been zoned, and that the use of appellants' land for commercial recreational use should have been phased out. A city merely may have embraced zoning which was created prior to its incorporation as part of regional plans. It should not be criticized because it retained the limited uses permitted by that zoning to the exclusion of others.

It is therefore concluded that on this record the exclusive features of the city's zoning ordinance do not render it subject to successful attack by the appellants who seek to perpetuate their commercial recreational use.

## II

The owners and operators of the picnic area contend that the enforcement of the ordinances against them denies them equal protection of the law because uses similar to those engaged in on their property are permitted on a nonprofit basis. The original interim ordinance (1956) did not expressly permit any use other than for agriculture or for a one-family dwelling. The first comprehensive ordinance (1959) expressly permitted private swimming pools, barns and stables (fn. 4 above), and it also authorized the issuance of a use permit for "Recreational Facilities. Recreational or community center buildings, ground for sports, except those customarily carried on for profit," and recognized the existence of recreational membership clubs operated by a nonprofit organization (fn. 5 above). The 1961 ordinance continued the provision for "Recreational Facilities" and the definition of "Clubs, Recreational," but deleted the reference to the parking limitation at "Recreational Clubs." Similar provisions were continued in the 1970 revision.

At the trial it was brought out that neither the Los Altos Hills Country Club nor its predecessor, the Adobe Creek Lodge and Country Club (see fn. 2 above) was a member-owned club, that the members acquired no proprietary interest but merely a license to use the facilities. Although an advisory board was created in 1962, it was discontinued in 1967. The club, started in late 1961, had a membership of about 250 families at the end of 1962. The membership remained at about 250 for several years. The sale of memberships has been promoted by newspaper, radio and television advertising, by telephone solicitation, and by salesmen, as many as six at one time, out selling memberships on a commission basis. About 1967 a membership director was hired, and about 800 or 1,000 memberships were sold in 1968. At the time of trial, October 1970, the club had about 800 members. Special initiation fee rates have been offered to those living at a great distance from the premises.

Testimony indicated that when the grounds were used for a company picnic, or for some widely advertised supper party, there was very heavy traffic on the roads leading to the premises. On a busy Saturday as many as 4,000 people have been on the property in various groups using different facilities of, what the operator described as, "a complete operational recreational park" (see fns. 2 and 3 above). As many as 5,000 or 6,000 can be accommodated if the whole facility is rented.

The evidence concerning other uses within the city limits indicate that there were some parcels on which there were more than one dwelling unit. (Apparently two dwellings are permitted on parcels of 1.99 acres or more

or, if an established nonconforming use, on a smaller parcel.) It was not determined whether or not such extra dwellings were customarily used for commercial rentals. It was established that there were several private schools in the city, one of which was an established nonconforming use. Although there is no "nonprofit" restriction on such an enterprise it was not determined whether the existing schools were operated for profit, or, as is usually the case, nonprofit. The "Town Planner" acknowledged that the commercial boarding of horses was being carried out on land within the city and that it was permitted by the city as an agricultural use. (See fn. 4 and cf. *Wint* v. *Fidelity & Casualty Co.* (1973) 9 Cal.3d 257, 262-263 [107 Cal.Rptr. 175, 507 P.2d 1383].) Attempts to show that there were established rental stables failed for lack of knowledge of the witness.

Reference to the Fremont Hills Country Club, a private tennis and swim club, revealed that it was operating under a use permit issued in 1958 as a private nonprofit recreation club, that it had a restaurant for its members, conducted dances and social events, and maintained stables on the property. The Town Planner was unable to testify as to whether the public at large attended social events at that club or whether the facilities were ever rented out, nor could he testify as to whether the club sponsored commercial tennis tournaments or horse shows at which admissions were charged and liquor and beverages were sold to those attending.

It was established that a riding academy had been in existence for five or ten years; that it was operated as a commercial venture for profit; and that it was operating under a use permit as a private school.

Appellants seek to apply the following rules to the classifications of use of property adopted and practiced by respondent city. In *Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194], the court struck down the provisions of Labor Code section 1850 which prohibited the employment of aliens on public works. The court stated: "The concept of the equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment. In cases involving 'suspect classifications' or 'fundamental interests' of those suffering discrimination, the United States Supreme Court prescribes a strict standard for reviewing the particular enactment under the equal protection clause. Not only must the classification reasonably relate to the purposes of the law, but also the state must bear the burden of establishing that the classification constitutes a necessary means of accomplishing a legitimate state interest, and that the law serves to promote a compelling state interest." (71 Cal.2d at pp. 578-579, fns. omitted.)

In subjecting the alien's right to employment to the strict standard of review the court further observed, ". . . the state may not arbitrarily foreclose to any person the right to pursue an otherwise lawful occupation. Any limitation on the opportunity for employment impedes the achievement of economic security, which is essential for the pursuit of life, liberty and happiness; courts sustain such limitations only after careful scrutiny." (*Id.*, p. 579. See also *Morey* v. *Doud* (1957) 354 U.S. 457, 469 [1 L.Ed.2d 1485, 1493-1494, 77 S.Ct. 1344]; *Takahashi* v. *Fish Comm'n.* (1948) 334 U.S. 410, 418-420 [92 L.Ed. 1478, 1486-1488, 68 S.Ct. 1138]; and *Yick Wo* v. *Hopkins* (1886) 118 U.S. 356, 373-374 [30 L.Ed. 220, 227-228, 6 S.Ct. 1064].) Other cases relied upon by appellants to show that the right to operate a commercial recreational facility on their property involves a "suspect classification" or "fundamental interest" are not in point.[9]

The sanctity that may attach to the right to make a living or pursue a lawful occupation is not involved here. Appellants confuse the right to engage in the business of conducting a commercial recreational facility, which is open to all of the persons who may reside in, or own property in, respondent city, with the right to engage in that occupation on property within the city limits. All such persons are equally denied that privilege. In order to establish that the provisions of the zoning ordinance are invalid as to them, the appellants must show that they are being deprived of their property without due process of law because the restrictions on its use do not bear a substantial relation to the public health, safety, morals or general welfare. (See *Nectow* v. *Cambridge* (1928) 277 U.S. 183, 188-189 [72 L.Ed. 842, 844-845, 48 S.Ct. 447]; *McKay Jewelers, Inc.* v. *Bowron* (1942) 19 Cal.2d 595, 601 [122 P.2d 543, 139 A.L.R. 1188]; *Skalko* v. *City of Sunnyvale* (1939) 14 Cal.2d 213, 215-216 [93

---

[9]Restraints on the right of interstate migration. (*Shapiro* v. *Thompson* (1969) 394 U.S. 618, 634 [22 L.Ed.2d 600, 615, 89 S.Ct. 1322]; and *Edwards* v. *California* (1941) 314 U.S. 160, at p. 178 [86 L.Ed. 119, 127-128, 62 S.Ct. 164], Douglas, J., concurring.) Restraints on the passage of laws against racial bias in the sale or rental of real property. (*Hunter* v. *Erickson* (1969) 393 U.S. 385, 390-393 [21 L.Ed.2d 616, 621-623, 89 S.Ct. 557].) Denial of equal representation on exercise of the voting franchise. (*Avery* v. *Midland County* (1968) 390 U.S. 474, 484-485 [20 L.Ed.2d 45, 53-54, 88 S.Ct. 1114]; and *Reynolds* v. *Sims* (1964) 377 U.S. 533, 568 [12 L.Ed.2d 506, 531, 84 S.Ct. 1362] [rehg. den. (1964) 379 U.S. 870 (13 L.Ed.2d 76, 85 S.Ct. 12)].) Restraint on marriage or promiscuity predicated on a racial basis. (*Loving* v. *Virginia* (1967) 388 U.S. 1, 11-12 [18 L.Ed.2d 1010, 1017-1018, 87 S.Ct. 1817]; and *McLaughlin* v. *Florida* (1964) 379 U.S. 184, 191-193 [13 L.Ed.2d 222, 227-229, 85 S.Ct. 283].) Prohibition of use of contraceptives. (*Griswold* v. *Connecticut* (1965) 381 U.S. 479, 485 [14 L.Ed.2d 510, 515-516, 85 S.Ct. 1678].) Denial of right to be free from use of evidence secured as a result of invasion of privacy by an unreasonable search and seizure. (*Mapp* v. *Ohio* (1961) 367 U.S. 643, 655 [6 L.Ed.2d 1081, 1090, 81 S.Ct. 1684].)

P.2d 93]; *Hurst* v. *City of Burlingame* (1929) 207 Cal. 134, 143 [277 P. 308]; and *Neary* v. *Town of Los Altos Hills* (1959) 172 Cal.App.2d 721, 726-728 [343 P.2d 155].) In order to defeat the regulation the property owner must show that there is no "reasonable basis for the belief that the establishment of a strictly residential district has substantial relation to the public health, safety, morals or general welfare, . . ." (*Wilkins* v. *City of San Bernardino, supra,* 29 Cal.2d 332, 339. See also other cases following quotations from *Wilkins* in part I.) Appellants have not undertaken to show that their property is valueless, or of less value than other property in the city if devoted to uses permitted by the ordinance. "It is not sufficient for [appellants] to show that it will be more profitable to [them] to make other use of [their] property, . . ." (*Id.,* at p. 338.)

The question is purely economic, and under the equal protection clauses of the state and federal Constitutions any alleged discrimination must be evaluated in accordance with the following principle: ". . . the United States Supreme Court has tended to employ a two-level test in reviewing legislative classifications under the equal protection clause. In the area of economic regulation, the high court has exercised restraint, investing legislation with a presumption of constitutionality and requiring merely that distinctions drawn by a challenged statute bear some rational relationship to a conceivable legitimate state purpose. [Citations.]" (*Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 784 [87 Cal.Rptr. 839, 471 P.2d 487] [vacated on other grounds (1971) 403 U.S. 915 (29 L.Ed.2d 692, 91 S.Ct. 2224)]. See also *Serrano* v. *Priest* (1971) 5 Cal.3d 584, 597 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187]; and *County of Riverside* v. *Whitlock* (1972) 22 Cal.App.3d 863, 870-876 [99 Cal.Rptr. 710].) In determining whether there has been any discrimination as claimed by appellants, the rational relationship test should be used.

Appellants rely upon *Roman Cath. etc. Corp.* v. *City of Piedmont, supra,* 45 Cal.2d 325 in which it was concluded that the ordinance involved was unconstitutional and void because of its arbitrary and unreasonable discrimination against private schools. The case does not throw light on the question of whether a distinction may be drawn between commercially motivated private schools and nonprofit and parochial private schools. Although the opinion gives lip service to the rule quoted above from *Wilkins* v. *City of San Bernardino* (see 45 Cal.2d at p. 326), it points out "that parents have the basic constitutional right to have their children educated in schools of their own choice, subject to reasonable regulations as to subjects required to be taught, manner of instruction, etc." (*id.,* at p. 329), and, "Parents have the right to send their children to private schools, rather than public ones, which are located

in their immediate locality or general neighborhood." (*Id.,* at p. 330.) Therefore, it appears that the court was in fact recognizing that education is a fundamental interest. (See *Serrano* v. *Priest, supra,* 5 Cal.3d at pp. 604-610.) In fact the court concluded, "Careful examination of the arguments in support of the legislation in question reveals that there is absent the *compelling justification* which would be needed to sustain discrimination of the nature here involved." (*Id.,* at p. 334, italics added. Cf. *Tustin Heights Assn.* v. *Bd. of Supervisors* (1959) 170 Cal.App.2d 619, 631-633 [339 P.2d 914].) There is no such fundamental interest involved in the uses which appellants seek to establish for their property. (See fns. 2 and 3 above.)

That there is a distinction between recreational uses for profit and recreational uses by a private membership club has been recognized in numerous decisions. In *Arents* v. *Squires* (1960) 7 N.Y.2d 1009 [200 N.Y.S.2d 52, 166 N.E.2d 848]; and 8 N.Y.2d 863 [203 N.Y.S.2d 910, 168 N.E.2d 712] the court affirmed a grant of a building permit to an existing use because the use was embraced in the prior permitted use of "clubhouse." (See 8 App.Div.2d 952 [190 N.Y.S.2d 594].) A dissent, seeking to reverse to determine whether the use was "conducted for gain" as prohibited by the ordinance, observed: "There is nothing sinister in the profit motive nor in the conduct of such a venture for gain. It just did not conform to the zoning ordinance if that was the fact. The large rental, the management and operation of the club by the promoters of the enterprise who owned the equity, and the circumstance that the club facilities were open to the use of the public patronizing the inns, restaurants and boarding houses in Southampton and vicinity—all of which are alleged as facts in the petition—created a question of fact requiring a trial in court concerning whether this was a clubhouse conducted or not conducted for gain." (7 N.Y.2d at p. 1014 [200 N.Y.S.2d at p. 55, 166 N.E.2d at p. 850]. See also *Nelson* v. *Pierce* (1953) 281 App.Div. 994 [120 N.Y.S.2d 804] and (Sup. 1952) 117 N.Y.S.2d 61]; and *Village of East Hampton* v. *Mulford* (1946) 188 Misc. 1037 [65 N.Y.S.2d 455].)

In *Carpenter* v. *Zoning Bd. of Appeals of Framingham* (1967) 352 Mass. 54 [223 N.E.2d 679] a commercial swimming "club" was granted a building permit under a law which permitted a "club" and a "recreational building and ground" within a residential area. The court stated, "Our basic inquiry is whether Catalina is a bona fide club with limited membership controlled by the members, into which admission cannot be obtained by any person at his pleasure, and in which the property is actually owned in common or held for the common benefit of the members, . . ." (352 Mass. at p. 56 [223 N.E.2d at p. 681].) The court

ruled that since the members other than the promoters had neither a common interest in the underlying assets of the "club" nor an effective method of participating in its management, the organization was not a club within the meaning of the ordinance. The court remarked, "We in no way decide that bona fide swimming clubs do not enjoy the same standing as other private clubs in residential districts under zoning by-laws similar to that adopted by the town of Framingham." (*Id.*, at p. 58 [*id.*, at p. 682].) On a second issue the court concluded that the zoning law did not contemplate the operation of a commercial venture in a residential zone. The court stated, "Recent decisions of this court have distinguished between commercial and noncommercial uses in determining whether a particular use was properly permitted in a residence district." (*Id.*, at p. 60 [*id.*, at p. 683.]. See also *Kurz* v. *Board of Appeals of North Reading* (1960) 341 Mass. 110, 113 [167 N.E.2d 627, 629]; *Dando* v. *King County* (1969) 75 Wn.2d 598, 602-603 [452 P.2d 955, 957-958]; *Shady Grove, Inc.* v. *Parish of Jefferson* (La.App. 1967) 203 So.2d 869, 870-871; but cf. *Howlett* v. *Lakeside Country Club* (La.App. 1967) 198 So.2d 402, 403-405; *McNalley* v. *Zoning Bd. of Review of City of Cranston* (1967) 102 R.I. 417, 419 [230 A.2d 880, 882]; *Gilbert* v. *Town of Hamden* (1949) 135 Conn. 630 [68 A.2d 157]; and *Golf, Inc.* v. *District of Columbia* (1933) 67 F.2d 575 [62 App.D.C. 309].)[10]

On the other hand in *Board of Zoning Appeals* v. *Columbia Pike Limited* (1972) 213 Va. 437 [192 S.E.2d 778], the court held that an

---

[10]For examples of decisions upholding denial of commercial club or recreational use in residential zone see: *Kropf* v. *Brooks* (1962) 17 App.Div.2d 829 [233 N.Y.S.2d 62]; *4 M Club, Inc.* v. *Andrews* (1960) 11 App.Div.2d 720 [204 N.Y.S.2d 610]; *Gruberg* v. *Henry* (1956) 5 Misc.2d 223 [163 N.Y.S.2d 1003]; *Schroeder* v. *Krueter* (1954) 206 Misc. 198 [132 N.Y.S.2d 144], affd. (1954) 284 App.Div. 972 [135 N.Y.S.2d 637], and (1955) 308 N.Y. 993 [127 N.E.2d 845]; and *Village of East Hampton* v. *Mulford* (Sup. 1946) 65 N.Y.S.2d 455. Cf. *Pearson* v. *Shoemaker* (Sup. 1960) 233 N.Y.S.2d 674; and *Nelson* v. *Pierce* (1953) 281 App.Div. 994 [120 N.Y.S. 2d 804], affg. (Sup. 1952) 117 N.Y.S.2d 61. See also *Cooper* v. *Maplewood Club* (1964) 43 N.J. 495 [205 A.2d 736]; and *Whitehead* v. *Kearny Zoning Bd. of Adjustment* (1958) 51 N.J.Super. 560 [144 A.2d 273]; but cf. *Tullo* v. *Township of Millburn in County of Essex* (1959) 54 N.J.Super. 483 [149 A.2d 620]; and *Tice* v. *Borough of Woodcliff Lake* (1951) 12 N.J.Super. 20 [78 A.2d 825]; and *Bright* v. *Zoning Board of Appeals of Fairfield* (1962) 149 Conn. 698 [183 A.2d 603]. See also 2 Anderson, American Law of Zoning (1968) sections 9.43-9.45, pages 197-204, section 11.10, pages 265-267, sections 11.35-11.36, pages 322-324, and sections 11.83-11.84, pages 462-464; 8 McQuillin, Municipal Corporations (3d rev. ed. 1965) section 25.131b, page 377 et seq., *passim;* 3 Yokley, Zoning Law and Practice (3d ed. 1967) section 28-3, page 258, section 28-7, page 263, section 28-15, page 287, section 28-47, page 342, section 28-62, page 374, section 28-65, page 377, section 28-67, page 378, and section 28-69, page 379; Annot., Zoning—Golf Courses, etc. (1970) 32 A.L.R.3d 424; and Annot., Zoning—"Club or Clubhouse" (1957) 52 A.L.R.2d 1098.

ordinance which required provision of a designated number of parking spaces for every 1,000 square feet of office space constructed did not prohibit the owner of the office building so constructed from making separate rental agreements for the parking spaces, even though the operation of "commercial parking lots" was prohibited in the area. The court stated, "The Board [of Zoning Appeals] has confused the *use* of property with *compensaiton for use* of property. These are two entirely separate and distinct things. [Citation.] [¶] . . . the General Assembly has authorized local governing bodies by ordinance to control the use and development of lands within their respective jurisdictions. There is no legislation, however, which enables these governing bodies to control the compensation of land or the improvements thereon." (213 Va. at p. 438 [192 S.E.2d at p. 779].)

In an earlier case the Virginia court held that an ordinance permitting " ' "Public and private parks, recreational areas and resorts, including golf courses, swimming pools, and boating facilities, together with structures accessory thereto" ' " expressly authorized the use of 97.75 acres for commercial recreation purposes, and that a further provision which required a special use permit for "clubs and grounds for games and sports, provided only such use is not primarily for gain" only applied to spectator sports and not to the proposed development. (*Mooreland* v. *Young* (1956) 197 Va. 771 [91 S.E.2d 438].)[11]

The facts in this case demonstrate that there is a rational relationship in excluding commercial recreational areas, while permitting clubs or recreational facilities operated by a nonprofit organization. Appellants propose to operate a commercial venture which, if their major advertising campaigns are successful, will bring persons in numbers almost equal to the population of the city into the city for recreation. On the other hand, although a nonprofit organization over the long run must secure sufficient clientele to support its activities, it is not under compulsion to attract increasing numbers to fill its coffers. When the nonprofit activities are conducted by a membership club there is a check on the number

[11]For examples of decisions in which commercial recreational uses have been sanctioned because the provisions of the zoning ordinance have been construed to permit such use, see: *Schumm* v. *Board of Supervisors* (1956) 140 Cal.App.2d 874 [295 P.2d 934]; *Hopping* v. *Cobb County Fair Association, Inc.* (1966) 222 Ga. 704 [152 S.E.2d 356]; *Hood* v. *Winding-Vista Recreation, Inc.* (1966) 222 Ga. 345 [149 S.E.2d 784]; *Berberich* v. *Concordia Gymnastic Society* (Mo.App. 1966) 402 S.W.2d 582; *In re Hart's Appeal* (1963) 410 Pa. 439 [189 A.2d 167]; *In re Appeal of Hawcrest Association* (1960) 399 Pa. 84 [160 A.2d 240]; *Montgomery County* v. *Merlands Club* (1953) 202 Md. 279 [96 A.2d 261]; and *Drennen* v. *Mason* (1931) 222 Ala. 652 [133 So. 689]. See also general sources set forth in footnote 10 above.

to be served, and the type of activities to be conducted because the members will themselves not wish to be discommoded by overtaxing the facilities. On balance the most that can be said is that whether the determination to exclude commercial, recreational facilities as distinguished from similar nonprofit facilities was " 'an unreasonable, arbitrary or unequal exercise of power is fairly debatable. In such circumstances, the settled rule of [the United States Supreme Court] is that it will not substitute its judgment for that of the legislative body charged with the primary duty and responsibility of determining the question.' " (*Wilkins* v. *City of San Bernardino, supra,* 29 Cal.2d at p. 339, quoting from *Zahn* v. *Board of Public Works* (1927) 274 U.S. 325, at p. 328 [71 L.Ed. 1074, at p. 1076, 47 S.Ct. 594].)

The mere fact that some uses of the property may prove to be similar does not render the ordinance unduly discriminatory. In *City of Long Beach* v. *California Lambda etc. Fraternity* (1967) 255 Cal.App.2d 789 [63 Cal.Rptr. 419], it was contended that the attributes of use as a fraternity house were identical to those of a boarding house or lodging house. The court, with an apparent low regard for the conduct of students living in a fraternity house, pointed out that many attributes of the life style in a fraternity house were absent in a permitted boarding house, lodging house or apartment. (255 Cal.App.2d at pp. 796-797.) So here there are attributes of the commercial venture which render it more offensive and burdensome to a residential neighborhood than the nonprofit club. It may also be pointed out that there was no showing here that there was discrimination in the city's manner of enforcing the ordinance. (See *id.,* at p. 797; and *City etc. of San Francisco* v. *Burton* (1962) 201 Cal.App.2d 749, 755-756 [20 Cal.Rptr. 378].)

Appellants point out that even nonprofit corporations may make a profit. Corporations Code section 9200 provides in part: ". . . Carrying on business at a profit as an incident to the main purposes of the corporation and the distribution of assets to members on dissolution are not forbidden to nonprofit corporations, but no corporation formed or existing under this part shall distribute any gains, profits, or dividends to any of its members as such except upon dissolution or winding up." (See also *Laurel H. Cemetery Assn.* v. *San Francisco* (1947) 81 Cal.App. 2d 371, 378 [184 P.2d 160].) *Cuzner* v. *The California Club* (1909) 155 Cal. 303 [100 P. 868] upon which appellants rely demonstrates that there is a valid distinction between a social club and a commercial venture insofar as the licensing of the sale of alcoholic beverages is concerned. In any event, the mere fact that there may be a profit on dissolution does not lessen the distinction between the day-to-day opera-

tions of the two types of recreational facilities. (155 Cal. at pp. 310-312.)

Finally they assert that *John Tennant Memorial Homes, Inc.* v. *City of Pacific Grove* (1972) 27 Cal.App.3d 372 [103 Cal.Rptr. 215] demonstrates that no lawful distinction can be drawn between nonprofit and commercial activities. There the court struck down a tax which purported to tax the occupants of nonprofit rest homes, and excluded the occupants of profit-motivated rest homes. The court found that there was no rational basis for the classification, on grounds, among others, that each type of occupant received the same services from the city (27 Cal.App.3d at p. 379). The court, however, pointed out, "The instant ordinance taxes not the owners for the privilege of doing business, but the retirees for the privilege of occupancy . . . an occupancy tax cannot distinguish between groups of occupants without a clear, reasonable and constitutional base." (*Id.,* p. 381.)

Here the ordinance under the zoning powers properly distinguishes between business uses and nonprofit uses. (See *Cuzner* v. *The California Club, supra,* 155 Cal. 303, 310-312.) The purpose of the ordinance is not for revenue but to provide for the public health, safety, morals and general welfare of the community. As has been noted above there is a rational distinction between the attributes of commercial and noncommercial recreational uses, and the burdens each imposes on the municipality and the residents within the city limits. The application of the provisions of the ordinance to appellants' property was properly adjudicated.

The judgment is affirmed.

Molinari, P. J., and Elkington, J., concurred.

The petition of all the appellants for a hearing by the Supreme Court was denied July 12, 1973.